CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

AUG 22 2007

JOHN F. CORCORAN, CLERK
BY:
       DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| SELMA MARIE MATHIAS FERRIS, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 5:06-CV-00082 |
| ) | |
| ) | **MEMORANDUM OPINION** |
| v. ) | |
| ) | |
| AAF-MCQUAY, INC. ) | By: Samuel G. Wilson |
| t/a McQuay International, ) | United States District Judge |
| ) | |
| Defendant. ) | |

This is a suit by plaintiff, Selma Marie Mathias Ferris ("Ferris"), against her former employer, AAF-McQuay, Inc. t/a McQuay International ("McQuay"), alleging that McQuay discriminated and retaliated against her in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq., when it terminated her employment. Ferris claims that McQuay terminated her because she has a breathing impairment and complained to the company's corporate headquarters after local management moved her out of a smoke-free environment. McQuay contends that it terminated Ferris as part of a financially-driven layoff because Ferris' job performance was substandard, not because of her alleged breathing impairment or to retaliate against her because she complained. The matter is before the court on McQuay's motion for summary judgment.[1] Viewing the evidence in the light most favorable to

---

[1] Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if there is sufficient evidence to allow a reasonable jury to return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

Ferris and giving her the benefit of all rational inferences supported by her forecast evidence, the court finds that Ferris has failed to raise a triable issue of fact that McQuay's proffered reason for discharging Ferris is pretextual. Accordingly, the court finds that McQuay is entitled to judgment as a matter of law and grants its motion for summary judgment.

### I.

McQuay produces, sells, and supports commercial air-conditioning and refrigeration equipment, including chiller products, applied air handling systems, applied terminal systems, and industrial refrigeration equipment. It has various manufacturing facilities to support its global business operations, including a manufacturing plant in Staunton, Virginia, where Ferris worked, that manufactures and produces chiller products.

Ferris began her employment with McQuay in November 1995 in a contract worker position, but was promoted to full-time employment as a "Quality Assurance Technician" ("QAT") in July 1996. In July 1997, Ferris suffered a severe episode of adult respiratory distress syndrome ("ARDS"), which is a respiratory illness and/or failure, often characterized by severe respiratory distress, and caused by various acute pulmonary injuries. Ferris required a lengthy hospitalization to recover from ARDS and its associated medical problems, including pneumonia, and she missed approximately five and one-half months of work. She alleges that the episode made her more sensitive to tobacco smoke, other irritants, and noxious fumes and resulted in her experiencing respiratory problems, including asthma, and more frequent and severe migraine headaches and bouts of depression.

According to Ferris, McQuay was supportive of her during her illness and held her position open until she recovered. Upon her return to the company on December 1, 1997, Ferris

2

admittedly did not initially inform McQuay of her sensitivity to smoke and did not request any sort of accommodation, despite the fact that the QAT position required Ferris to leave her non-smoking office and work on the plant's manufacturing floor, where smoking was permitted and where brazing fumes, forklift exhaust, and other noxious fumes were present. Shortly after her return, McQuay moved Ferris to a trailer-office on the outer edge of the plant's manufacturing floor. While this office was non-smoking, it was not "smoke free," because the trailer's air conditioning unit drew air from the manufacturing floor. Furthermore, Ferris' job continued to require her to work on the manufacturing floor. In fact, Ferris estimates that, in the course of her employment at McQuay, she worked on the manufacturing floor more than 500 times.

In January 1999, Ferris accepted a lateral transfer from her QAT position to a position in McQuay's service department and also moved to a non-smoking office which was not located on the manufacturing floor. In June 2000, McQuay promoted Ferris to the position of "Quality Assurance Engineer I" ("QAE I"), the same position from which she was ultimately terminated, and she remained in a non-smoking office which did not draw air from the manufacturing floor.

In the spring of 2003, McQuay decided to restructure its Staunton facility's organization. In conjunction with this restructuring, Scott Crickenberger assumed the role of "Manufacturing Engineering and Quality Manager" and became Ferris' direct supervisor. At the time that Crickenberger's new position was announced on May 12, 2003, Ferris was the only employee in the quality assurance department whose office was not located on the manufacturing floor. Crickenberger decided to consolidate the offices of quality assurance personnel and move Ferris to a non-smoking office in a mezzanine complex on the manufacturing floor, informing her of this decision on July 14, 2003. According to Ferris, this move violated a verbal agreement that

3

she had secured from Crickenberger when he became her supervisor that he would not move her "anywhere where there was cigarette smoke." While Ferris admits that her new office was "non-smoking," she found it unacceptable because the office circulated air from the manufacturing floor of the facility.[2] She also objected to the new location because to reach her office she had to walk through areas of the facility where McQuay permitted smoking.[3]

After Crickenberger allegedly dismissed her protests, Ferris contacted Colleen Nornes in McQuay's Minnesota corporate human resources ("HR") department on July 15, 2003, to voice her concerns about the move. Nevertheless, McQuay moved Ferris to the mezzanine office on July 16, 2003, where she stayed until September 4, 2003, when the company transferred her back to her prior smoke-free office.[4] Ferris contends that Crickenberger and the head of Staunton HR, Grafton "Bill" Weaver, became angry and embarrassed when Ferris contacted McQuay's corporate office to contest her office move and alleges that they began to target Ferris because of her contact with corporate personnel. Ferris claims that Crickenberger's animus is reflected in

---

[2] Ferris had submitted a note, dated April 29, 2003, from a physician treating her for pain management that stated she should avoid exposure to secondhand smoke "due to migraine trigger effect."

[3] Ferris admits, however, that the location of her office before the July 2003 move, to which she ultimately returned in September 2003, also required her to walk through areas of the company's facility where smoking was permitted.

[4] In total, Ferris worked in the mezzanine office for approximately seven weeks, during which time she submitted another note from her pain specialist that stated that she should avoid "all forms of second hand smoke." During these weeks, Ferris contacted Nornes a number of times through e-mail to reiterate her request for a smoke-free work environment. Nornes responded by communicating with Crickenberger, Staunton HR, and other McQuay personnel many times to try to analyze the extent of the problem and to develop a solution. Ferris admits, for example, that the head of Staunton HR discussed with her the company's intent to create a non-smoking pathway from the front lobby area through the manufacturing plant that McQuay believed would benefit Ferris.

4

her 2003 and 2004 performance evaluations in which he gave her low scores and noted several areas in which Ferris needed to improve her performance.

During the summer of 2004, McQuay started losing money because production orders fell, and the plant manager, Barry Fisher, decided to lay off employees to cut costs. According to Fisher, McQuay determined which hourly employees to discharge by referencing an existing collective bargaining agreement. With respect to salaried employees, Fisher decided whom to terminate by asking the plant's department managers to identify non-essential employees in their departments. According to McQuay, Fisher personally identified a production supervisor, Jack Chandler, who was performing below expectations, and Crickenberger advised Fisher that Ferris was the lowest ranking employee in his department and that he could manage the department without her. Fisher decided to lay off approximately forty hourly employees and to discharge Chandler and Ferris, terminating Ferris on October 1, 2004. Crickenberger assumed Ferris' responsibilities, and McQuay did not add an employee to the quality assurance department for more than a year after Ferris' discharge. Ferris filed a charge of discrimination with the EEOC, and the EEOC issued her a right to sue letter.

## II.

While the elements of the prima face case of a discriminatory discharge claim and a retaliatory discharge claim differ, the proof schemes for both follow the familiar burden-shifting format established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), ultimately requiring proof that "an employer's asserted non-discriminatory reason for the challenged employment action is actually a pretext." Rowe v. Marley Co., 233 F.3d 825, 829 (4th Cir. 2000); see also Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 57-59 (4th Cir.

5

1995) (applying McDonnell Douglas to an ADA discriminatory discharge claim where the employer disavowed any reliance on discriminatory reasons for its adverse employment action); Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 706 (4th Cir. 2001) (applying McDonnell Douglas to an ADA retaliatory discharge claim). Therefore, Ferris has the initial burden of proving prima face cases of discrimination and retaliation.[5] If Ferris satisfies this burden, McQuay must articulate a reasonable, non-discriminatory and nonretaliatory reason for her termination. If it does so, Ferris must demonstrate that the proffered reason is a pretext for the forbidden discrimination or retaliation. Ennis, 53 F.3d at 58; Haulbrook, 272 F.3d at 706. In the present case, however, even if the court assumes that Ferris can establish prima facie cases of discriminatory and retaliatory discharge, she nevertheless cannot survive summary judgment. Viewing the evidence in the light most favorable to Ferris and allowing her all reasonable inferences, the court finds that Ferris has failed to rebut the proffered legitimate, nondiscriminatory and nonretaliatory reason for Ferris' termination – that McQuay selected Ferris for termination as part of a financially-driven layoff because she was the lowest ranked employee in her department.

McQuay asserts that the company terminated Ferris because it needed to eliminate non-essential employees in light of an economic downturn. McQuay has provided undisputed evidence that it faced a substantial business slowdown in the fall of 2004 because production

---

[5] To establish a prima facie case of discriminatory discharge, Ferris must demonstrate "that (1) [s]he is within the ADA's protected class; (2) [s]he was discharged; (3) at the time of [her] discharge, [s]he was performing the job at a level that met [her] employer's legitimate expectations; and (4) [her] discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." Haulbrook, 252 F.3d at 702 (4th Cir. 2001). To establish a prima facie claim of retaliatory discharge under the ADA, Ferris must establish that she engaged in protected activity; that McQuay took an adverse action against her; and that a causal connection existed between the adverse activity and the protected action. Id. at 706.

6

Case 5:06-cv-00082-SGW-JGW   Document 46   Filed 08/22/07   Page 6 of 12   Pageid#: 766

orders had recently declined. According to McQuay, the plant manager asked his management team to identify non-essential, poor-performing employees, and Ferris' then-supervisor, Crickenberger, identified her as the lowest ranking member of the quality assurance department. McQuay offered substantial evidence that Ferris had performed below expectations for over two years before the company terminated her, which is summarized in two unsatisfactory performance evaluations that Crickenberger gave Ferris in 2003 and 2004,[6] and Ferris admits that she received a lower score than co-workers on a performance criterion relating to the achievement of an industry certification. Furthermore, Ferris concedes that she performed poorly, admitting that her depression and physical condition were major factors in her 2003 negative performance rating, admitting that she lacked "concentration and focus," and arguing that she would have improved her performance had she received a formal written notification that her job was in jeopardy. Ferris also acknowledges that prior to her discharge, she had been concerned at various times that she would be laid off and admits that the size of the quality assurance department had fluctuated over the years from a high of approximately thirteen employees to a low of approximately five employees because of financially-driven layoffs. Further buttressing McQuay's claim that Ferris' discharge was non-discriminatory and non-retaliatory is its undisputed proof that the company released approximately forty hourly

---

[6] Crickenberger's first evaluation of Ferris, dated August 15, 2003, reviewed her job performance in the period between July 2002 and June 2003. Overall, on a scale of one to five, Crickenberger rated Ferris as a "2 – Needs Improvement" and noted that Ferris needed to improve her leadership and interpersonal skills. Ferris admittedly signed the evaluation without disputing it. Crickenberger's second performance evaluation, dated September 24, 2004, covered the period between July 2003 and June 2004 and noted that Ferris still showed substandard performance in the areas of leadership, interpersonal skills, and time management. Crickenberger again ranked Ferris overall as a "2 - Needs Improvement," noting that Ferris had "not shown developmental growth" in her role as a QAE and had struggled with the company's certification efforts.

7

employees and at least two salaried employees, Jack Chandler and Ferris, as part of its downsizing efforts. Ferris does not dispute that Crickenberger assumed her responsibilities after her discharge and that McQuay did not hire anyone in the quality assurance department for over a year after her discharge.

Ferris nonetheless contends that McQuay's proffered reasons for her termination are pretextual, arguing that Crickenberger gave Ferris poor performance reviews because he was angry and embarrassed that she had contacted corporate HR to contest her office assignment, that McQuay did not follow its evaluation procedures, that McQuay offered inconsistent reasons for Ferris' termination, and that the unavailability of a potential witness raises an inference of pretext. However, taken in the light most favorable to Ferris, her evidence falls short of proving pretext.

First, Ferris suggests that the timing and content of Crickenberger's 2003 performance review prove that Crickenberger had a discriminatory and retaliatory animus toward her, pointing out that she received an overall score of "3 - Meets Expectations" from her prior supervisor in her 2002 evaluation and that Crickenberger gave her a "2 - Needs Improvement" on her 2003 review soon after she had contacted corporate HR to resist her office change.[7] While Ferris did receive a higher score in her 2002 performance review, her then-supervisor, Thomas Watson,

---

[7] Ferris does not allege that the plant manager retaliated against her when he chose to terminate her, but that Crickenberger's animus caused the plant manager's decision. The fact that the plant manager rather than Crickenberger made the final discharge decision is not fatal to Ferris' case, however, as "the person allegedly acting pursuant to a discriminatory animus need not be the 'formal decisionmaker' to impose liability upon an employer for an adverse employment action, so long as the plaintiff presents sufficient evidence to establish that the subordinate was the one 'principally responsible' for, or the 'actual decisionmaker' behind, the action." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 288-89 (4th Cir. 2004) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151-52 (2000)). Ferris alleges that Crickenberger was the "actual decisionmaker" in her termination.

noted that Ferris needed to "be more proactive [and] involved with the [manufacturing] shop," a comment that mirrors similar concerns raised by Crickenberger in his evaluations of Ferris. Additionally, the unrebutted evidence shows that other McQuay employees also reported problems with Ferris' performance,[8] and Ferris concedes that her performance was poor, although she attempts to attribute her poor performance to her health problems.[9] Although Ferris believes her performance evaluations in 2003 and 2004 were the product of Crickenberger's discriminatory and retaliatory animus, there is nothing in the record to suggest as a reasonable probability that Crickenberger did not truly believe that Ferris' job performance was poor and at a level below her co-workers, and her "unsupported speculation [to the contrary]. . . is not enough to defeat a summary judgment motion." Ennis, 53 F.3d at 62; see also DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998) ("With respect to the opinion testimony, we have repeatedly explained that '[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.'") (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 960-61 (4th Cir. 1996)).[10]

---

[8] For example, on October 28, 2003, Ginny Ward, a McQuay employee who was handling a component of the certification process that Ferris was responsible for overseeing, contacted the plant manager through e-mail to complain that Ferris had failed to provide necessary training and documents to co-workers despite repeated requests by Ward and promises by Ferris. Ward also described Ferris' performance in her role as certification coordinator as "miserable."

[9] In an e-mail to McQuay corporate HR, Ferris wrote, "I feel that the deterioration of my physical and mental health was why I was given "needs improvement" on my [2003 performance evaluation] since the three months I worked for my new boss (and was also the period evaluated on) coincided with my higher level of depression and therefore my lack of concentration and focus."

[10] For similar reasons, the court finds unpersuasive Ferris' argument that she was "singled out for special negative treatment" when Crickenberger gave Ferris a lower score than other members of the quality assurance department on an evaluation criterion pertaining to the

9

Ferris also argues that McQuay's failure to follow its own internal evaluation procedures constitutes evidence of pretext. Ferris claims that McQuay failed to follow its established procedures when it did not create a formal personal improvement plan ("PIP") for her after she received her 2003 evaluation, alleging that Crickenberger failed to fill out a PIP in order to "'set [Ferris] up' to fail so that she could be terminated." McQuay's standard evaluation form states that a "Performance Improvement Plan is required" if an employee receives an overall performance score of "1 - Unacceptable" or "2 - Needs Improvement." McQuay admits that a PIP is meant to inform an employee of his or her poor performance and communicate expectations for improvement. Although it is undisputed that Ferris did not receive a written PIP after receiving a score of "2," it is clear that Ferris was aware of her poor performance, as she acknowledged her 2003 performance evaluation with her signature, and that she met with Crickenberger to discuss the evaluation. Furthermore, Ferris offered no evidence to contradict Crickenberger's assertion that he met with her often to discuss performance issues and expectations. The evidence establishes that Ferris received the type of information concerning her performance and expectations that she would have received in a written PIP.[11]

---

company's certification efforts. To the extent that Ferris' proffered opinion testimony has any relevance, it fails to prove as a reasonable probability that Crickenberger's evaluations were either false or pretextual for discrimination. It is undisputed that Ferris' job required her to take a larger role in the certification process than her co-workers, and nothing in the record suggests that Crickenberger did not actually think that Ferris struggled to fulfill her certification responsibilities. See DeJarnette, 133 F.3d at 299 (suggesting that an employee must present evidence "reasonably calling into question the honesty of his employer's belief") (quoting Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 410, 411 (7th Cir. 1997)).

[11] However, even if there were a factual dispute as to whether McQuay followed its established procedures, this dispute is immaterial, as the case that Ferris cites for the proposition that an employer's "[f]ailure to follow established procedures with respect to an employee's discharge has been held to support a finding of discriminatory discharge," Stiles v. General Elec. Co., 1993 U.S. App. LEXIS 2870, No. 92-1886, 1993 WL 46889 at *4 (4th Cir. Feb. 12, 1993),

10

Finally, the court notes that it also rejects Ferris' contention that the parties' inability to locate the former director of Staunton's HR department and potential witness, Bill Weaver, raises an inference of pretext. Ferris does not dispute that McQuay advised her that it had not been able to locate Weaver and that Ferris could try to reach him directly. The court rejects Ferris' suggestion that "we can rightly infer" that Weaver "would have corroborated [her] accusations in this case, and likewise, would have contradicted the testimony of Mr. Crickenberger and Mr. Fisher about why Ms. Ferris was terminated." See Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (noting that a party may not create a genuine issue of material fact "through mere speculation or the building of one inference upon another").

Simply, Ferris has forecast no evidence that casts doubt on the veracity of McQuay's proffered explanation for her termination,[12] and no reasonable factfinder could conclude from these facts that Ferris has carried her burden to establish pretext. Given the undisputed evidence regarding McQuay's economic circumstances at the time of Ferris' discharge, the documented evidence of Ferris' poor performance, and the general weakness of Ferris' claims, McQuay's decision to discharge Ferris "can only be viewed as a rational business decision that courts may not upset." Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 513 (4th Cir. 1994). It follows that

---

also notes that "deviation from established procedures creates no presumption of discrimination, especially when there is little other evidence supporting a finding of discrimination," id. Here, because there is no evidence supporting a finding of discrimination or retaliation, the absence of a formal, written PIP simply does not constitute evidence of pretext.

[12] The court also rejects Ferris' argument that McQuay offered at least two inconsistent explanations for Ferris' termination. The court has analyzed the entire record and concludes that McQuay has consistently stated that it selected Ferris for termination as part of a financially-driven layoff because she was the lowest-ranked employee in her department.

11

Ferris has failed to establish a genuine issue of material fact, and McQuay is therefore entitled to summary judgment.

### III.

For the reasons stated, the court grants the defendant's motion for summary judgment.

**ENTER**: This 22nd day of August, 2007

_____
UNITED STATES DISTRICT JUDGE